## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

HERITAGE OPERATIONS GROUP,
LLC, et al.,

               Plaintiffs,

               v.

FELICIA NORWOOD, et al.,

               Defendants.

Case No. 17-cv-8609

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Heritage Operations Group, LLC sued Defendants Felicia Norwood and Seema Verma in their official capacities as, respectively, the Director of the Illinois Department of Healthcare and Family Services (HFS) and the Administrator of the Centers for Medicare & Medicaid Services (CMS). Heritage, acting on behalf of numerous long-term care facilities that it operates in Illinois, alleges that HFS violated federal Medicaid laws and Heritage's due-process rights when it retroactively changed Medicaid's reimbursement rates for those facilities. Heritage alleges that CMS acted unlawfully by approving the Illinois Medicaid plan under which HFS changed the reimbursement rates.

Heritage moved for a temporary restraining order (TRO) shortly after filing this case. Defendants opposed the TRO and simultaneously moved to dismiss Heritage's complaint for failure to state a claim. For the reasons explained below, this Court grants Defendants' motions and denies Heritage's motion for a TRO.

1

## I. The Complaint's Allegations

Heritage operates long-term care facilities throughout Illinois. [1] ¶ 1. These nursing facilities receive per diem reimbursement for Medicaid beneficiaries from HFS, which administers the Illinois Medicaid program. *Id.* ¶¶ 3, 21. CMS administers Medicaid at the federal level. *Id.* ¶ 8.

Medicaid is a voluntary program, jointly funded by the federal government and state governments, that primarily provides medical care for poor, elderly, and disabled people. *Id.* ¶ 6. States that choose to fund Medicaid must administer their programs in accordance with the authorizing legislation in Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, also known as the Medicaid Act. To participate in Medicaid, a state must submit its state plan for medical assistance to CMS for approval. [1] ¶ 7.

The Medicaid Act requires each state plan to include certain procedural and substantive elements. *Id.* ¶ 16. Relevant here, state plans must provide "a public process for determination of rates under the plan" that involves: (1) publishing proposed rates and the methodologies and justifications underlying the proposed rates; (2) giving providers, beneficiaries, and "other concerned State residents" a "reasonable opportunity" to review and comment on the published materials; and (3) publishing the final rates and the methodologies and justifications underlying the final rates. *Id.* (quoting 42 U.S.C. § 1396a(a)(13)(A)). States must also provide public notice of any "significant proposed change" in their statewide methods and standards for setting payment rates. *Id.* ¶ 17 (quoting 42 C.F.R. § 447.205(a)). CMS will

approve a change to a state plan only after receiving satisfactory assurances from the state's Medicaid agency that the state employs "procedures under which the data and methodology used in establishing payment rates are made available to the public." *Id.* ¶ 20 (quoting 42 C.F.R. § 447.253(b)(1)(iii)).

The per diem reimbursement that nursing facilities receive from HFS under the Illinois plan consists of three separate components: (1) support cost; (2) nursing cost; and (3) capital cost. *Id.* ¶ 21. This case concerns the nursing component, also known as the direct care component. *See id.* ¶¶ 29–51.

## A.     The Nursing Component and On-Site Facility Reviews

HFS uses a Resource Utilization Groups (RUGs) system to calculate reimbursement rates for nursing facilities.[1] 305 ILCS 5/5-5.2. Under this "resident-driven, facility-specific, and cost-based" methodology, HFS updates individual reimbursement rates on a quarterly basis. *Id.* To enable these updates, Illinois facilities must submit Minimum Data Set (MDS) assessments to HFS quarterly. Ill. Admin. Code tit. 89, § 147.315. MDS assessments provide information about the medical needs of each resident in a given facility, which allows HFS to classify each resident under a specific RUG code and establish a given facility's "case mix." *See id.* § 147.325. The facility's case mix then factors into HFS' calculation of the facility's nursing component, which "shall be the product of the statewide RUG-IV nursing base per diem rate, the facility average case mix index, and the regional wage

---

[1] This Court takes judicial notice of the Illinois statutes and regulations that establish how HFS calculates reimbursement rates and how HFS audits nursing facilities. *See Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002). Even though Heritage's complaint does not explain the calculation process, understanding that process proves useful to analyzing Heritage's claims.

adjustor." 5/5-5.2(e-2).

HFS sometimes conducts on-site reviews to verify the accuracy of a facility's MDS data. *See* Ill. Admin. Code tit. 89, § 147.340. HFS may randomly select the facilities it audits or may audit a facility based upon discretionary factors, such as a facility's "atypical patterns of scoring MDS items." *Id.* During a review, HFS informs the facility of "any preliminary conclusions regarding the MDS items/areas that could not be validated," and the facility has an opportunity to present HFS with any documentation supporting its position. *Id.* § 147.340(o). A facility must provide all relevant documentation to the HFS team before the team finishes its on-site review. *Id.* § 147.340(p).

If HFS concludes that a facility submitted inaccurate MDS data, HFS reclassifies the necessary residents with the correct RUG codes and determines if using accurate data would change the nursing component of the facility's reimbursement rate. *Id.* § 147.340(s). HFS may change a facility's per diem reimbursement rate "retroactive to the beginning of the rate period" if recalculating the facility's nursing component decreases the per diem rate by more than one percent. *Id.* § 147.340(t). A facility may appeal any change to its specific reimbursement rate within 30 days of receiving notice of the change from HFS; a facility may not, however, rely upon additional documentation for the appeal that it did not present to HFS during the original review. *Id.* § 147.340(u). HFS then has 120 days to address a facility's request for reconsideration, and "individuals not directly involved" in the original review determine whether to make further

4

adjustments to the facility's reimbursement rate. *Id.* § 147.340(v).

### B. State Plan Amendment and Heritage Audits

In 2017, CMS approved an amendment to Illinois' state plan, effective retroactive to January 2016, that provided for the MDS on-site reviews and retroactive rate adjustments discussed above. [1] ¶ 55; [6-2] at 3 (letter from CMS to Norwood describing the approved change).[2] Illinois codified that plan amendment in section 147.340 of its Administrative Code. *See* [1] ¶ 55.

Throughout 2016 and 2017, HFS audited numerous Heritage facilities pursuant to its authority under section 147.340. *Id.* ¶¶ 29–51. When Heritage filed its complaint, it had not yet received audit results for two of its facilities, but HFS significantly reduced the nursing component at every other Heritage facility that it audited. *See id.* The per diem rate changes "affected all residents in the facilities retroactively." *Id.* ¶ 53. Heritage claims that the lost revenue from the HFS audits negatively impacts its facilities' abilities "to provide adequate quality of care" to their nursing patients and might force it to reduce staffing. *Id.* ¶¶ 71–72.

## II. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[2] This Court may consider the CMS approval letter and the plan amendment—which Heritage attached as exhibits to its TRO motion—on a motion to dismiss because the documents are central to the complaint and the complaint refers to them. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Williamson*, 714 F.3d at 436.

In evaluating a complaint, this Court accepts all well-pled allegations as true and draws all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Rule 12(b)(6) limits this Court to considering the complaint, documents attached to the complaint, documents central to the complaint (to which the complaint refers), and information properly subject to judicial notice. *Williamson*, 714 F.3d at 436.

## III.  Analysis

Heritage's complaint asserts four claims. Count I alleges that HFS violated Heritage's substantive and procedural due-process rights when HFS audited Heritage's facilities and retroactively adjusted the facilities' per diem reimbursement rates. [1] ¶¶ 73–83. Count II alleges that HFS violated the Medicaid Act and its implementing regulations by changing Heritage's reimbursement rates after the audits without going through a public notice and comment process first. *Id.* ¶¶ 84–92. Count III, brought under 42 U.S.C. § 1983, seeks declaratory and injunctive relief against HFS and CMS based upon the alleged violations of the Medicaid Act. *Id.* ¶¶

6

93–107.  Finally, Count IV alleges that this Court, pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706, should set aside CMS' approval of Illinois' state plan amendment as "based on errors of law" and "unsupported by substantial evidence."  *Id.* ¶¶ 108–10.  This Court addresses the claims against each Defendant in turn, starting with HFS.

### A.    Claims Against HFS

### 1.    Count I: Due-Process Violations

Count I alleges that HFS violated Heritage's substantive and procedural due-process rights by auditing Heritage's facilities and retroactively adjusting their per diem reimbursement rates.  [1] ¶¶ 73–83.  HFS argues that both the substantive and procedural portions of Count I fail because Heritage cannot identify any protected property interest with which HFS interfered.  [19] at 5–6.

As always, protected property interests must arise from an independent source, such as state or federal law.  *See Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008).  For a property interest to merit due-process protection, the plaintiff must have "a legitimate claim of entitlement" to that property interest, not simply "a unilateral expectation of it."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  And the interest itself must be "substantive rather than procedural in nature."  *Manley v. Law*, 889 F.3d 885, 890 (7th Cir. 2018).

The complaint asserts that Heritage has a protected property interest, [1] ¶¶ 74, 80–82, but offers no allegations to properly define or otherwise identify the property interest.  In its response brief, Heritage argues that the Seventh Circuit has

held that healthcare providers have a constitutionally protected property interest in payments for providing services to Medicaid patients. [25] at 8 (citing *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 824 (2017)). Heritage, however, misrepresents the holding in *BT Bourbonnais*. There, the Seventh Circuit held that the plaintiff nursing-home operators had "an enforceable *procedural right*" to the public process outlined in § 1396a(a)(13)(A) of the Medicaid Act, and so could proceed with their claim against HFS under § 1983. *BT Bourbonnais*, 866 F.3d at 824 (emphasis added). But the court said nothing about substantive property rights and nothing about constitutional due process. A procedural right to enforce certain procedural guarantees contained in the Medicaid Act does not necessarily equate with a protected property interest for purposes of a due-process claim. *See Manley*, 889 F.3d at 890.

Heritage also cites the concurring opinion from *Tekkno Laboratories, Inc. v. Perales*, 933 F.2d 1093 (2d Cir. 1991), to argue that it has a protected property interest in per diem Medicaid reimbursement. [25] at 8. That case does not help Heritage either. In *Tekkno*, the plaintiff clinical lab sued New York's Medicaid agency after the agency withheld payment on about $700,000 in claims, pending an investigation into whether the lab submitted false claims and accepted illegal kickbacks. 933 F.2d at 1094. Although the concurrence acknowledged that New York law creates a property interest "in money paid for services already performed in reliance on a duly promulgated reimbursement rate," *id*. at 1100 (Oakes, J., concurring) (quoting *Oberlander v. Perales*, 740 F.2d 116, 120 (2d Cir. 1984)), the

majority distinguished *Oberlander* because *Oberlander* did not involve "the State's withholding of payments pending investigation," *id.* at 1098; *see also Yorktown Med. Lab., Inc. v. Perales*, 948 F.2d 84, 89 (2d Cir. 1991) ("Yorktown has no property interest grounded in either the Medicaid Act or New York regulations to payment for claims pending investigation to determine illegality.").

Likewise, *Oberlander* proves inapplicable here. HFS did not retroactively change a duly promulgated reimbursement rate; it retroactively changed a reimbursement rate contingent upon quarterly patient data that was subject to MDS audits and resulting adjustments per the terms of the Illinois state plan. *Cf. Oberlander*, 740 F.2d at 118 (New York's Department of Health informed the plaintiff provider months in advance that "its reimbursement rate for calendar year 1983 had been fixed at $99.84 per patient per day"). Notably, while Heritage's complaint offers a barrage of attacks against the procedures that HFS used (or failed to use) to retroactively adjust Heritage's reimbursement rates, the complaint does not suggest that HFS erred in concluding that Heritage's facilities submitted inaccurate MDS data. *See generally* [1]. Against that background, it is difficult to conceive how Heritage could assert "a legitimate claim of entitlement" to reimbursement rates based upon inaccurate medical records that it submitted to HFS. *See Roth*, 408 U.S. 577. Holding that Heritage has a protected property interest here would effectively recognize a property interest in reimbursement for claims that Heritage "knew or should have known contravened state regulations" requiring it to submit accurate MDS assessments to HFS each quarter. *See Yorktown*, 948 F.2d at 89; Ill. Admin.

Code tit. 89, § 147.315 (facilities must submit data that "accurately reflects the resident's status during the timeframes identified").  Aside from the two cases discussed above, Heritage provides no other authority supporting its claim that it has a protected property interest in its per diem Medicaid reimbursement rates.  Thus, this Court dismisses Count I.

### 2.    Count II: Medicaid Act Violations

Count II alleges that HFS violated the Medicaid Act and its implementing regulations by reducing Heritage's reimbursement rates after the MDS reviews without going through a public notice and comment process, and by reducing rates for each facility, rather than for individual residents.  [1] ¶¶ 84–92.  HFS argues that this claim fails because Heritage misinterprets the Medicaid Act and the Illinois state plan.  [19] at 15–18.  This Court agrees.

Simply put, Heritage stakes this claim on procedural requirements that do not apply when HFS changes reimbursement rates at specific facilities pursuant to the Illinois state plan, as opposed to when HFS seeks to change the state plan itself.  Although this Court must accept Heritage's factual allegations as true on a motion to dismiss, *Iqbal*, 556 U.S. at 678, this Court need not (and does not) accept Heritage's erroneous legal conclusions as true, *Brooks*, 578 F.3d at 581.

As HFS notes, Heritage's position that the Medicaid Act requires public notice and comment every time a state Medicaid agency changes the reimbursement rate at a particular facility (because the facility could not validate its previously submitted patient data) is "staggeringly impractical."  [35] at 7.  It also has no basis in law.

10

Section 1396a(a)(13)(A) of the Medicaid Act establishes procedural requirements that states must follow when they change the rate-setting methodologies in their state plans, not when they apply existing state plans to adjust payment rates at individual facilities. *See Christ the King Manor, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 315 (3d Cir. 2013) (explaining that § 1396a(a)(13)(A)'s "notice requirements must be satisfied in order for a *state plan amendment* to receive approval") (emphasis added). Similarly, the implementing regulation requires "public notice of any significant proposed change" to "*Statewide* methods and standards for setting payment rates." 42 C.F.R. § 447.205 (emphasis added). Thus, HFS' actions—applying its existing, CMS-approved plan to reduce reimbursement rates at Heritage's facilities after conducting on-site MDS reviews—did not trigger the Medicaid Act's procedural safeguards. *See id.*; § 1396a(a)(13)(A). As CMS notes, an MDS review "no more changes Medicaid payment rates" under a state plan "than an IRS audit changes tax rates." [23] at 11.

Heritage also claims that § 1396a(a)(13)(A) does not allow retroactive rate adjustments. [25] at 15. Again, Heritage misinterprets the Medicaid Act. True, § 1396a(a)(13)(A)'s notice and comment requirements would not allow retroactive adjustments to the *state plan's* payment methodologies. But HFS did not make any changes to the state plan here; it simply applied the existing state plan to retroactively adjust reimbursement rates at specific facilities that submitted inaccurate MDS data for that quarter. *See* [1] ¶¶ 29–51. Both the state plan amendment that CMS approved and section 147.340 plainly allow retroactive rate

11

adjustments at individual facilities after MDS reviews. *See* [6-2] at 6 (amendment provides that "a facility's rate shall be subject to change" after an audit reveals "unverifiable" MDS data, and the recalculated rate will be "retroactive to the beginning of the rate period"); § 147.340(t) (same language). If HFS could not update reimbursement rates retroactively after audits, that would lead to the absurd result of providers keeping windfalls that they gained from submitting inaccurate or fraudulent MDS data.[3]

Finally, contrary to Heritage's arguments, [25] at 17, HFS could not possibly adjust reimbursement rates for individual residents without changing the overall facility's rate. A facility's MDS assessments provide clinical information about each resident, which HFS uses to establish the facility's overall case mix. *See* § 147.325. The facility's case mix is one of three elements that HFS uses to calculate the nursing component of the facility's reimbursement rate. *See* 5/5-5.2(e-2). And a facility receives the *same* per diem reimbursement for each resident; it does not receive a uniquely calculated per diem for each resident, because that would defeat the purpose of using a case-mix system to capture the scope of medical needs across a facility's residents. *See* § 147.325; § 147.310 (implementing the case mix system). So, reclassifying individual residents after an MDS review necessarily changes a facility's case mix and thus its overall reimbursement rate.

Considering that statutory scheme, Heritage has no legal basis to assert that HFS has authority only to update reimbursement rates for individual residents

---

[3] For example, Heritage alleges that many of its facilities had to return hundreds of thousands of dollars to HFS after their audits. [1] ¶¶ 29–49.

12

rather than a facility as a whole. Accordingly, this Court dismisses Count II.

### 3. Count III: Declaratory and Injunctive Relief Under § 1983

Count III seeks declaratory and injunctive relief against HFS based upon the alleged violations of the Medicaid Act. [1] ¶¶ 93–107. HFS argues that the Eleventh Amendment bars the relief that Heritage seeks in this claim, and that the claim fails on the merits regardless. [19] at 18–21.

Broadly speaking, the Eleventh Amendment bars private individuals from suing nonconsenting states for money damages in federal court. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). That bar extends to suits that seek to recover money from a state—"the real, substantial party in interest"—regardless of whether the plaintiff names the state as a party. *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). But private individuals may sue state officials to challenge "the constitutionality of a state official's action in enforcing state law," and federal courts may grant "prospective injunctive relief to prevent a continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

First, Heritage seeks a declaration that HFS violated Heritage's civil rights by refusing "to allow for a public process under which it determines the Medicaid daily rate." [1] ¶¶ 100–01. As this Court held above, HFS did not have to comply with such procedural requirements when it simply applied its existing state plan to retroactively adjust quarterly reimbursement rates at audited facilities. Regardless, even if Heritage understood the Medicaid Act properly (which it does not), the Eleventh Amendment does not allow a federal court to issue a declaratory judgment

13

that a state official's *past* conduct violated federal law. *See Green*, 474 U.S. at 74. Heritage unconvincingly argues that its requested relief concerns only "ongoing violations of the Medicaid Act," [25] at 19, but that argument remains untethered to the complaint, which seeks a judgment that HFS violated Heritage's rights by completing audits in the past, *see* [1] ¶¶ 100–01.

Next, Heritage seeks a "preliminary injunction" and a "mandatory injunction" under § 1983, "*retroactive* to January 1, 2016," that will force HFS to "establish the appropriate reimbursement rates" for Heritage through the public process that Heritage believes the Medicaid Act requires. [1] ¶¶ 102–04 (emphasis added). Again, Heritage's complaint fails to show that HFS did anything wrong in retroactively adjusting reimbursement rates at audited facilities without providing for a public notice and comment process. Regardless, the Eleventh Amendment prohibits the retroactive relief that Heritage seeks, which would force the state of Illinois to pay Heritage retroactive benefits after establishing different reimbursement rates. *See Edelman*, 415 U.S. at 678 (a federal court may not issue "a retroactive award which requires the payment of funds from the state treasury"); *see also Christ the King Manor*, 730 F.3d at 319–20 (holding that the Eleventh Amendment barred the plaintiff providers' request that the court order Pennsylvania's Medicaid agency to pay them "prospective corrective payments" as compensation for incorrect rates that the agency paid five years previously).

Heritage also seeks a "mandatory injunction pursuant to the due process clause" requiring HFS to provide Heritage with "sufficient fair hearing and appeal

14

rights concerning any audit process." [1] ¶ 105. As this Court held above, Heritage does not have a viable due-process claim (substantive or procedural) because it fails to articulate any protected property interest to support such a claim, so Heritage has no right to the requested injunction.

Besides, the appeals process established in section 147.340 appears entirely consistent with due process. Heritage challenges, for example, the fact that section 147.340(p) does not permit a facility to submit additional documentation on appeal that the facility did not submit to HFS during the initial on-site MDS review. [25] at 12. Heritage fails, however, to provide any legal authority explaining why that provision violates its due-process rights—a glaring omission considering the obvious similarities between that provision and the well-accepted rule that a litigant cannot present arguments to an appellate court that it did not first present to the district court. *See, e.g.*, *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (Arguments "not raised to the district court are waived on appeal" because "it is the parties' responsibility to allege facts and indicate their relevance under the correct legal standard.").

Finally, Heritage seeks an injunction requiring HFS to cease an ongoing audit of Heritage's Pana facility. [1] ¶ 106. As discussed more below, because Heritage fails to establish any legal reason to end the audit, this request also does not get off the ground.

Heritage raises one more argument in its response brief that deserves discussion. In full, the argument reads: "A state's decision to accept financial

15

assistance from the federal government waives any Eleventh Amendment immunity. *Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000). Damages for violations of the Rehabilitation Act, therefore, may be sought by Plaintiffs." [25] at 20. This argument fails for several reasons. First, the Supreme Court has expressly held—in a case involving the Medicaid program—that a state does not waive its sovereign immunity simply by accepting federal funds. *See Fla. Dep't of Health & Rehabilitative Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981) (the "mere fact" that a state participates in a cooperative federalism program does not establish "consent on the part of the State to be sued in the federal courts"). Second, Heritage blatantly misreads *Stanley*. In *Stanley*, the Seventh Circuit held that "the Rehabilitation Act is enforceable in federal court against recipients of federal largesse," 213 F.3d at 344, because Congress included unequivocal language in that Act abrogating states' sovereign immunity for suits under § 504 of the Act, *see Lane v. Pena*, 518 U.S. 187, 198 (1996). *Stanley* in no way issued a blanket holding that states waive their sovereign immunity by accepting federal funds. Finally, the Rehabilitation Act protects disabled individuals from discrimination. *See id.*; 29 U.S.C. § 791, *et seq.* Heritage is an LLC; it is not a disabled person and so could not bring a Rehabilitation Act claim. This Court dismisses Count III as to HFS.

### B.    Claims Against CMS

####    1.    Count III: Declaratory and Injunctive Relief Under § 1983

CMS argues that Count III fails because it acted under color of federal law when it approved the amendment to the Illinois state plan. [23] at 10. To state a

16

claim under § 1983, a plaintiff must allege that someone acting under color of state law deprived the plaintiff of a constitutional or statutory right. *See Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017). Put differently, a § 1983 action "cannot lie against federal officers acting under color of federal law." *Case v. Milewski*, 327 F.3d 564, 567 (7th Cir. 2003).

Heritage's complaint alleges that CMS, a federal agency, relied upon its authority under the federal Medicaid Act when it approved the amendment to Illinois' state plan that provided for MDS on-site reviews. *See* [1] ¶¶ 7, 20. Thus, Heritage's § 1983 claim against CMS cannot proceed. *See Case*, 327 F.3d at 567. Heritage argues that CMS qualifies as a state actor here because CMS and HFS have a "symbiotic relationship," stating: "Thus, CMS as the agency charged with implementing the Medicaid Act, acts as a state by adopting State Plan Amendments for implementation at the state [sic] as drafted by the state." [34] at 7. That characterization does not comport with the complaint's allegations or the reality of the Medicaid program, and thus, it does not save Heritage's claim. *See Strickland ex rel. Strickland v. Shalala*, 123 F.3d 863, 867 (6th Cir. 1997) (reversing a district court's award of attorney's fees against the Secretary of Health and Human Services, and stating that no other court "has extended the 'under color of state law' element of § 1983 to the implementation of a cooperative federalism program by federal officials").

Heritage next moves (in a footnote) for leave to amend its complaint to add a § 1983 conspiracy claim against CMS (but interestingly, not against HFS), and asserts

that request in its response brief. [34] at 8, 8 n.1. Although a plaintiff ordinarily may not amend its complaint by filing a response brief, *see Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011), this Court, however, has no need to grant Heritage's motion, because adding a conspiracy claim would not change the result.

The Seventh Circuit has assumed without deciding that federal employees may face liability under § 1983 if they "conspire or act in concert with state officials" to violate a plaintiff's rights under color of state law. *Case*, 327 F.3d 564, 567. So, to state a § 1983 conspiracy claim here, Heritage must allege that: (1) CMS employees and state actors reached an agreement to deprive Heritage of its constitutional or statutory rights; and (2) overt acts in furtherance of the conspiracy actually deprived Heritage of those rights. *See Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Heritage's claim fails there is no factual basis that CMS or its employees reached an improper agreement with state actors. *See generally* [1]. Indeed, Heritage's response brief does not even attempt to identify any such agreement; Heritage argues only that CMS' approval of the Illinois MDS amendment "is an overt act by CMS inflicting unconstitutional injury by denying due process in furtherance of the state objective." [34] at 8. Absent any good faith basis of an unlawful agreement between CMS and state actors, that alleged overt act does not suffice to maintain a conspiracy claim against CMS. *See Beaman*, 776 F.3d at 510. Thus, this Court dismisses Count III as to CMS.

18

### 2.    Count IV: APA Review

Count IV asks this Court, pursuant to the APA, to set aside CMS' approval of Illinois' state plan amendment as "based on errors of law" and "unsupported by substantial evidence."  [1] ¶¶ 108–10.  CMS raises numerous arguments against Count IV, including that Heritage does not have standing to assert an APA claim against CMS because Heritage fails to allege facts demonstrating that its injury is traceable to CMS' actions or that a favorable decision against CMS would likely redress Heritage's alleged injury.  [23] at 14–15 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Heritage responds by (again) misinterpreting *BT Bourbonnais* and claiming that *BT Bourbonnais* demonstrates its standing here.  [34] at 2–3.  Heritage's response on the issue of standing essentially quotes from *BT Bourbonnais* in which the Seventh Circuit discusses and applies the Supreme Court's three-factor test for determining whether a statute creates a federal right that a plaintiff may enforce through a § 1983 claim.  *Id.* (quoting *BT Bourbonnais*, 866 F.3d at 821–22).  As this Court discussed above, however, the Seventh Circuit answered that question affirmatively regarding § 1396a(a)(13)(A) of the Medicaid Act.  *BT Bourbonnais*, 866 F.3d at 824.  But the fact that § 1396a(a)(13)(A) creates an enforceable procedural right does not, on its face, show that Heritage has standing under the APA to challenge CMS' approval of a specific state plan amendment; *BT Bourbonnais* did not involve any APA claims or claims against CMS.  *See id.*  Heritage quotes *BT Bourbonnais* ad nauseam but fails to connect *BT Bourbonnais* to its purported

standing under the APA. Indeed, Heritage fails to address any of CMS' specific arguments regarding traceability and redressability, *see* [34] at 2–3, both of which Heritage must demonstrate to show its standing to bring this claim, *see Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing these elements."). Thus, Heritage has waived any argument on those issues, *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"), so this Court dismisses Count IV for lack of standing.

Alternatively, this Court observes that Heritage's complaint fails to plead any facts suggesting that CMS acted arbitrarily and capriciously in approving the Illinois amendment. For example, Heritage alleges that CMS "approved a process whereby a facility was granted the ability to recalculate a particular resident's daily rate," and that HFS unlawfully implemented section 147.340 in a manner inconsistent with the substance of the amendment that CMS approved. [1] ¶¶ 55–56. Those allegations do not show any wrongdoing by CMS; instead, they claim that HFS went rogue and strayed from CMS' approval. Count IV remains dismissed.

## C. Heritage's Motion for a TRO

Heritage moved for a TRO to prevent HFS from continuing to audit two of Heritage's facilities and from recouping any further amounts from Heritage's previously audited facilities. [4] at 2. To obtain a TRO, Heritage must show that it meets the standard for obtaining a preliminary injunction. *See YourNetDating, Inc. v. Mitchell*, 88 F. Supp. 2d 870, 871 (N.D. Ill. 2000). Thus, among other things,

Heritage must show that: (1) without a TRO, it will suffer irreparable harm in the interim period prior to this Court resolving its claims; (2) traditional legal remedies would be inadequate; and (3) its claims have some likelihood of succeeding on the merits. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). At this stage, Heritage has no chance of success on the merits, given this Court's dismissal of each of its claims. Accordingly, this Court denies Heritage's motion for a TRO.

## IV. Conclusion

This Court grants Defendants' motions to dismiss [18, 22] and denies Heritage's motion for a TRO [4]. If Plaintiff's counsel can file an amended complaint consistent with this order and the ethical requirements of Rule 11, then it must be filed on or before 10/8/18. If no amended complaint is filed by that date, then the case will be terminated.

Dated: September 18, 2018

Entered:

John Robert Blakey
United States District Judge

21